IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DAVID W. WATTS,

                Plaintiff,                     OPINION AND ORDER

      v.                                   10-cv-550-wmc

DAN WESTFIELD and RICK RAEMISCH,

                Defendants.

Plaintiff David W. Watts filed this civil action pursuant to 42 U.S.C. § 1983, concerning the conditions of his confinement by the Wisconsin Department of Corrections ("WDOC") and while serving part of his sentence out of state under the terms of an Interstate Corrections Compact and upon his return to WDOC's Dodge County Correctional Institution. Defendants filed a motion for summary judgment (dkt. #97), and Watts filed a lengthy response (dkt. #124). After considering the motion, the record and the applicable law, the court will grant defendants' motion and dismiss this case on grounds of qualified immunity.

BACKGROUND[1]

Watts is presently incarcerated by the WDOC at the Columbia Correctional Institution in Portage. Defendant Rick Raemisch was WDOC Secretary from 2007

---

[1] The following facts are based on the record, the parties' admissions (some for summary judgment only) and previous court proceedings.

through January 2011, when he retired from that position.[2]  Defendant Dan Westfield was the Corrections Security Chief for the WDOC Division of Adult Institutions from 2005 through April 2013, when he was appointed warden of Oakhill Correctional Institution.

This case originally stems from Watts's agreement to testify as a witness for the prosecution in a Wisconsin state court criminal proceeding.  In 2006, Watts was in state custody serving a 180-year sentence when he agreed to testify as a jailhouse informant in the homicide prosecution against Jose A. Vega in Manitowoc County Case No. 06CF21. In exchange for Watts's testimony, agents with the Wisconsin Department of Justice ("WDOJ") Criminal Investigations Bureau promised they would protect him before, during and after the trial.  When his identity as a witness was published in the local newspaper, however, Watts was threatened and attacked by other inmates at the Manitowoc County Jail.

After Watts testified in August 2007, Watts was transferred from the Manitowoc County Jail to the Waupun Correctional Institution ("WCI").  While housed in the most secure portion of WCI, Watts learned that another inmate had discovered his identity as an informant and witness for the state in the Vega case.  Watts claims that these details were disclosed by an unidentified WDOC staff member.  Thereafter, Watts claims that he was intimidated, threatened and harassed by other WCI inmates.

---

[2] In July 2013, Raemisch was appointed as Executive Director for the Colorado Department of Corrections.

In October 2007, Watts spoke with WDOJ Special Agent Rick Luell and asked to be placed in federal custody at a prison facility near his son in Las Vegas, Nevada.  Luell told Watts that he would personally call Security Chief Westfield to have Watts moved to federal custody.   Shortly thereafter, Watts was transferred to the Colorado Department of Corrections ("Colorado DOC") pursuant to an Interstate Corrections Compact.[3]   *See* Wis. Stat. §§  301.21, 302.25, 302.26.

In June 2008, Watts wrote to Westfield, complaining that a special agent promised he would be housed in a federal prison near Las Vegas, Nevada, so that he could be near his son.  In July 2008, Westfield assured Watts that housing him within the Colorado DOC provided him with the safety necessary to live among the general population. Westfield also advised Watts that he was not aware of any promise to house him in federal prison, and encouraged Watts to take advantage of the programming and work opportunities offered to him in the Colorado DOC.

In 2009, Westfield was contacted by Michael Saunders (the WDOC Security and Emergency Operations Corrections Specialist), after a social worker at DCI forwarded Saunders a letter from Watts.[4]   In that letter, Watts raised concerns about his safety after former Wisconsin inmates reportedly recognized him at his housing institution in Colorado.  Watts also alleged that staff members in the Colorado DOC had threatened

---

[3] An Interstate Corrections Compact is a formal agreement "between two or more states to transfer prisoners, parolees, or probationers from the physical custody or supervisory custody of one state to that of another." ENCYCLOPEDIA OF AMERICAN PRISONS 263 (Maryilyn D. McShane & Frank P. Williams, eds., 1996).

3

him, fraternized inappropriately with other inmates and provided them with contraband. Westfield directed Saunders to refer the letter to his counterpart in Colorado due to the allegations of staff misconduct and safety issues. Saunders contacted the Interstate Corrections Compact Administrator for the Colorado DOC, Don Morton, who followed up on the allegations. Morton's investigation never uncovered anything. Morton noted, however, that staff was keeping a "close eye" on Watts because he had acquired a reputation as a "snitch."

In 2010, Watts filed this lawsuit against Westfield and Raemisch, alleging that they failed to keep him safe from harm in Colorado. According to Watts, it is well known by inmates that WDOC sends "most if not all of their snitches and protective custody inmates to [Colorado]." As a result, Watts indicates that he was beaten numerous times and raped twice while in custody in Colorado. He contends further that there is a "contract" out on his life and that death threats have also been made against his family. In addition to his claims against Raemisch and Westfield, Watts sued three agents employed by WDOJ (Rick Luell, Tina Virgil and Michael Mysewski) for breaching their promise to keep him safe in exchange for his testimony in the Vega case. Watts, who suffers from sleep apnea, claimed further that he was denied a CPAP machine by Colorado officials because WDOC would not authorize one.

---

[4] As an inmate serving a Wisconsin prison term in an out-of-state facility under an Interstate Corrections Compact, Watts's file was maintained at DCI during the time he was assigned to the Colorado DOC.

4

After screening all of the pleadings pursuant to the Prison Litigation Reform Act, 28 U.S.C. § 1915A, the court allowed Watts to proceed with Eighth Amendment claims that defendants Westfield and Raemisch failed to (1) protect him from harm at the Colorado prison to which he was transferred; and (2) provide him with a CPAP machine for his sleep apnea. (Dkt. #20). Thereafter, the court allowed Watts to proceed with supplemental complaint alleging that Westfield and Raemisch also failed to protect him from physical violence at Dodge Correctional Institution ("DCI"), where Watts was assigned in 2011, following his return from prison in Colorado. (Dkt. #69). In particular, Watts filed an inmate grievance in April 2012, complaining that his personal safety and the safety of his family had been threatened but that staff members were doing nothing to help and were telling other inmates that he was a snitch.

Defendants have now moved for summary judgment. Arguing that they had little, if any, involvement in Watts's placement or the conditions of his confinement, both defendants maintain that they are entitled to qualified immunity from suit because Watts cannot establish a constitutional violation on their part.


OPINION

The purpose of summary judgment is to determine whether the parties have gathered and can present enough evidence to support a jury verdict in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Summary judgment is appropriate if: (1) there are no

genuinely disputed, material facts; and (2) on the undisputed facts, the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The applicable substantive law will dictate which facts are material.   *Darst v. Interstate Brands Corp*., 512 F.3d 903, 907 (7th Cir. 2008).   A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Ill*., 424 F.3d 659, 667 (7th Cir. 2005).

In determining whether a genuine issue of material fact exists, the court must construe all facts in favor of the nonmoving party.   *Schuster v. Lucent Technologies, Inc*., 327 F.3d 569, 573 (7th Cir. 2003).   Even so, the non-movant may not simply rest on the allegations in his pleadings; rather, he must respond by presenting specific facts that would support a jury's verdict in his favor on his claims.   *Hunter v. Amin*, 583 F.3d 486, 489 (7th Cir. 2009); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).   Here, Watts has been unable to provide sufficient evidence to permit a finding that the named defendants are not subject to qualified immunity.

I.   Qualified Immunity

Governmental actors performing discretionary functions enjoy "qualified immunity," meaning that they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Escobedo v. Bender*, 600 F.3d 770,

778 (7th Cir. 2010) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)).   As a defense, "[q]ualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   This defense gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions.   When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether a defendant is entitled to qualified immunity, a court must consider two questions: (1) whether plaintiff has alleged or shown a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time the alleged violation occurred.   *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "Qualified immunity is applicable unless the defendant's conduct violated a clearly established constitutional right."   *Id.*   A court is permitted to consider these questions in any order in light of the circumstances in the particular case at hand.   *Id*. at 236.

Although qualified immunity is a defense, the plaintiff bears the burden of defeating it.   *Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003).   In this instance, Watts fails to establish that either Raemisch or Westfield committed a constitutional violation.   Accordingly, defendants are entitled to qualified immunity.

Watts's claims are governed by the Eighth Amendment, which: (1) prohibits "punishment" that is "cruel and unusual"; and (2) imposes a duty on prison officials to provide "humane conditions of confinement" by ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials also must ensure that "reasonable measures" are taken to guarantee inmate safety and prevent harm. *Id*.

To prevail under the Eighth Amendment based on a failure to prevent harm, an inmate must demonstrate that: (1) the harm that befell the prisoner was objectively, sufficiently serious that it posed a substantial risk to his health or safety; and (2) the individual defendants were deliberately indifferent to the risk. *Id*.; *see also, e.g., Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citing *Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003) (citation omitted)). Here, Watts has not offered enough evidence to permit a finding that either Raemisch or Westfield had sufficient personal involvement with his underlying claims to establish deliberate indifference.

## II. Personal Involvement

Other than citing to their positions as supervisory officials, Watts offers no evidence that Raemisch or Westfield were meaningfully and personally involved in the conditions of his confinement in Colorado or at DCI. As the Supreme Court has held, there is no respondeat superior liability under § 1983. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978). This means that supervisors cannot be "vicariously

8

liable" for the conduct of their subordinates. *See Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) (*en banc*), *cert. denied*, 133 S. Ct. 2796 (2013). Thus, "knowledge of subordinates' misconduct is not enough for liability. The supervisor must want the forbidden outcome to occur." *Id*. (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009)).

A supervisor may be liable under § 1983 for failing to stop others from committing unconstitutional acts, but only if that officer had a reasonable opportunity to prevent the misconduct. *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004). Absent allegations that a supervisory official personally caused, participated in, or had a reasonable chance to stop the alleged harm from occurring, a plaintiff fails to establish liability on the part of that supervisory official. *George*, 507 F.3d at 609.

As former Secretary of WDOC, Raemisch had general, supervisory authority over the state prison system as a whole, but there is no evidence that he was personally involved in any of the placement decisions concerning Watts, either in Colorado or at DCI.

While Westfield made the initial arrangements for Watts to be transferred from WDOC to Colorado in order to protect his safety, his personal involvement ended there. Although Watts wrote letters to Westfield regarding safety concerns, the record shows that these issues were handled by officials in Colorado. Similarly, when Watts filed an inmate complaint regarding his personal safety at DCI in April 2012, the grievance was investigated by an Inmate Complaint Examiner and security personnel at DCI.

9

In addition, neither Raemisch nor Westfield had any involvement in Watts's medical care, his treatment for sleep apnea or his need for a CPAP machine. Diagnostic and treatment services are provided to inmates by health care professionals employed at the inmate's respective institution, including physicians, nurse practitioners or physician assistants. Physicians and mid-level practitioners are also responsible for determining the need for any potential offsite medical procedures and diagnostics for inmates, some of which may also require prior authorization through the Wisconsin Bureau of Health Services, pursuant to the governing interstate corrections compact. The physicians and mid-level practitioners overseeing the inmate's care are responsible for making those requests for prior authorization. However, the record confirms that neither Raemisch nor Westfield was responsible for approving medical treatment to meet Watts's needs while he was housed in Colorado.

Certainly, Watts presents evidence showing that he was a prolific letter-writer and that he frequently complained to medical staff and security personnel about the conditions of his confinement. However, Watts's assumption that Raemisch and Westfield must be liable because they knew or should have known about a problem is flawed. *See Burks v. Raemisch*, 555 F.3d 592, 593, 595 (7th Cir. 2009) ("Burks's view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate

a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care.   That can't be right.").

Since Watt's showing falls well short of the requisite showing for liability under 42 U.S.C. §  1983, *id.*, defendants' motion for summary judgment will be granted.


ORDER

IT IS ORDERED that:

1) Defendants Dan Westfield and Rick Raemisch's motion for summary judgment (dkt. # 97) is GRANTED and this case is DISMISSED with prejudice.

2) The clerk of court shall enter judgment in favor of defendants and close this case.

Entered this 11th day of July, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

11